NOT RECOMMENDED FOR PUBLICATION
FILE NAME: 24A0377N.06

Case No. 23-1770

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 04, 2024
KELLY L. STEPHENS, Clerk

DARIUS RUSH,

    Petitioner - Appellee,

v.

CHRIS KING, Warden,

    Respondent - Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

---

Before: **BATCHELDER, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.**

**PER CURIAM.** Darius Rush was an incorrigible home invader. When he and three accomplices were arrested for the armed and forcible home invasion of a 79-year-old man, all four confessed. Rush and his uncle Darnell went to trial where one of the other two perpetrators testified against them pursuant to a plea agreement. At trial, Rush's counsel used Rush's confession to his benefit, as if it were Rush's testimony, thereby avoiding cross-examination and the introduction of evidence of Rush's prior home invasions and his concurrent break-in of a car. Relying on Rush's confession, in which Rush admitted to the non-violent crimes but denied any role in the violent crimes (e.g., armed robbery, carjacking), his attorney persuaded the jury to acquit Rush of the violent charges and convict him on only the nonviolent charges. Rush appealed his sentence but not his conviction. The state appellate court agreed in part, reducing his sentence by several years. In state post-conviction proceedings, Rush claimed that trial and appellate counsel were ineffective, but the state court rejected those claims, holding that Rush had procedurally defaulted all of his claims by failing to raise them on direct appeal.

Rush filed this habeas petition, claiming that his trial counsel was ineffective for failing to challenge Rush's confession as false and coerced, conceding Rush's guilt to the nonviolent charges, failing to cross examine witnesses, and preventing Rush from testifying. To overcome his procedural default, Rush claimed that his appellate counsel was ineffective for failing to raise those claims on direct appeal. The district court held an evidentiary hearing at which Rush testified and presented suspiciously contrived stories about his actual innocence, how the police had coerced him into a false confession, and his trial and appellate attorneys' inexplicable refusal to talk with him, listen to him, or protect his rights. Afterward, Rush added a new claim that his trial counsel was ineffective for failing to suppress Rush's confession on the basis that police had interrogated Rush despite his demand for counsel and desire to remain silent. The district court believed Rush, disbelieved all contrary evidence, and granted him habeas relief.

Because Rush procedurally defaulted all of his claims in the state courts, and because he cannot establish cause and prejudice sufficient to overcome that procedural default, he cannot prevail on his petition. The judgment is REVERSED, and the petition is DENIED.

## I. BACKGROUND

### A. Rush's Prior Criminal History

On April 26, 2006, at age 14, Darius Rush committed a misdemeanor "larceny in a building" and was caught.[1] That September, he appeared in juvenile court with counsel, pled guilty, and was sentenced to probation. When he violated that probation in May 2007, the court

---

[1] Three weeks earlier, on April 4, 2006, the police had arrested Rush and charged him with felonious assault. In September 2006, he appeared in juvenile court with counsel, where the charges were dismissed.

sentenced him to juvenile detention until February 2010. He left juvenile detention in the eleventh grade, without a degree or a GED.[2]

In April 2011, at age 19, Rush committed two separate felony "home invasions, second degree" for which he pled guilty and was convicted. The police arrested Rush for an attempted home invasion in May 2011, but they never charged him for that crime because, after waiving his *Miranda* rights, he admitted to and described a home invasion that he committed on April 8, which matched an open investigation from a prior report. The victim was an 81-year-old woman who lived alone. While she was away from home, sometime between 12:45 and 5:15 p.m., Rush climbed in a window and stole jewelry, a computer, and a TV. The State charged him with felony second degree home invasion, and he appeared in a Michigan trial court with counsel and pled guilty in June 2011. The state-court presentence investigation report (prepared June 2011) included an unexplained statement by the investigating case worker that: "The instant offense was one of several home invasions the defendant referenced to committing." In July the state court sentenced Rush to two years of probation under the Michigan Holmes Youthful Trainee Act (HYTA).

In September 2011, the police arrested Rush for a home invasion that he had committed back on April 5 and the State charged him with felony second degree home invasion. In October, he appeared with counsel and pled guilty. On November 30, the court sentenced him to additional probation under the HYTA. Just six weeks later, he committed the home invasion at issue in this

---

[2] In his testimony at the evidentiary hearing in the district court, Rush suggested that he struggled to read because he had quit school in "I think the ninth grade. Ninth or tenth." The district court citied this testimony to assert that "Petitioner [Rush] has only a 9th grade education." *Rush v. Douglas*, No. 2:20-cv-11540, 2023 WL 4874774, at *3 (E.D. Mich. July 31, 2023). But the record consistently and repeatedly states that, while Rush entered juvenile detention in the ninth grade, he left juvenile detention at 18 years old, in the eleventh grade.

case. So, when the police arrested Rush on January 15, 2012, he had already been arrested, questioned by police, represented by counsel, convicted, and sentenced at least three times. It is certainly fair to say that Rush was familiar with the judicial process.

### B. This Home Invasion

At about 10:15 a.m. on January 9, 2012, Rush was one of four men who went to the home of 79-year-old Floyd Fulgiam to rob him.[3] The other three men were Rush's uncle Darnell and Rush's friends Deandre Cannady and Desmond Robinson. Robinson had suggested the robbery, claiming that Fulgiam had a hoard of gold. So, Robinson drove them to Fulgiam's house and parked on the street in front of the neighboring house. While the others waited, Robinson went up the steps onto Fulgiam's front porch and knocked on the front door. Fulgiam answered but kept the security gate closed. Robinson asked about buying the 1995 Chevrolet Caprice station wagon parked in the driveway, and Fulgiam declined. But when Darnell joined them on the porch and offered $3,000 for the car, Fulgiam opened the security gate and asked for their contact information. Darnell then attacked Fulgiam, pushed him through the door and into the house, and pinned him down on a couch. Holding Fulgiam down with a razor blade pressed to his neck, Darnell threatened Fulgiam not to move or he would kill him.

Robinson, Cannady, and Rush entered the house, demanding to know "where the gold at?" Rush ransacked the house, searching the back bedroom and the upstairs rooms, where he found and stole Fulgiam's wife's jewelry, which Rush sold at a pawn shop later that day. Robinson searched Fulgiam's pockets and took his wallet and car keys. The men fled, with Cannady using Fulgiam's keys to steal his 2009 Chevrolet Impala sedan. Fulgiam retrieved his handgun, ran

---

[3] It appears that Fulgiam was physically limited, albeit not infirm, as the trial court judge commented several times on his struggles to walk and climb onto the witness stand.

4

outside after them, and shot at Robinson's fleeing car. Fulgiam called the police and together they used On-Star to locate and recover his stolen car, which had been abandoned in Detroit. Fulgiam later attended a police lineup, but he could not identify any of the four men. [4]

Meanwhile, at 12:47 p.m. that afternoon, Rush pawned the stolen jewelry for $128 at the Coins and Stamps shop in Grosse Pointe. The store's exterior security cameras recorded Rush's arrival in a car with Darnell and another man, Christopher Alexander. The interior cameras recorded the transaction. Rush also provided his driver's license and thumbprint to the clerk. Outside the store after Rush had pawned the jewelry, the security cameras captured Rush engaging briefly with the other two men, who then drove off together. Rush, however, approached a parked car, smashed the window using a screwdriver, and stole an iPhone from the console. Rush fled on foot. The car's owner discovered the robbery shortly thereafter and called the police.[5]

## C. Investigation and Prosecution

The next day, January 10, police officers found Desmond Robinson hiding under a table in an abandoned house and arrested him.[6] When they questioned him, he confessed and then identified and implicated the other three.

---

[4] Fulgiam testified that he is virtually blind in one eye from a prior assault and has trouble with his memory.

[5] The State charged Rush with larceny from a motor vehicle, Rush pled guilty, and the trial court sentenced him to 7.5 years in prison for that conviction. That case is not at issue here.

[6] The record contains conflicting accounts as to how the police identified Robinson. In one account, Robinson gave Fulgiam his name and phone number, which Fulgiam passed on to the police. In another account, Fulgiam found an Osborne High School ID for Desmond Robinson on the ground where Robinson had parked, and gave that to police.

Reportedly, the State charged Robinson with three counts (armed robbery, carjacking, and first degree home invasion), he pled guilty, and was convicted. *See Michigan v. Robinson*, 903 N.W.2d 563 (Mich. 2017); Michigan Dept. of Corr. Website (https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=808339). But this record contains little information about Robinson's prosecution. On January 19, 2012, the Michigan trial court referred Robinson for a competency hearing. There is also mention that Robinson appeared in the courtroom for Rush's initial sentencing. Regardless, Robinson's situation is not material to the present case or appeal.

Two days later, on January 12, Deandre Cannady went to the police station voluntarily to confess. He waived his *Miranda* rights and described the home invasion as above, identifying each of the other three perpetrators. On January 14, the police arrested Darnell, who was not initially forthcoming. So, an officer brought Cannady into the room to show Darnell that Cannady was cooperating. Cannady told Darnell they were caught and to just tell the truth. Darnell waived his *Miranda* rights, confessed, and described the home invasion as above.

On January 15, Darnell went with the police to help them locate and arrest Rush. Once Rush was arrested and in a room for questioning, an officer brought in Darnell, who spoke with Rush alone for about ten minutes. After the police returned and removed Darnell, Rush waived his *Miranda* rights and confessed to the home invasion, to pawning the stolen jewelry at the pawn shop, and to breaking into a car parked there to steal an iPhone. In his written statement, Rush described the events of the home invasion as above, but specifically denied that he had ever touched Fulgiam or his car and asserted that Darnell alone had assaulted Fulgiam.

The State charged Cannady with six counts, but he agreed to cooperate and pled guilty to lesser counts: first degree home invasion, conspiracy to commit first degree home invasion, receiving and concealing a stolen motor vehicle, unlawful driving away of a vehicle, and unarmed robbery. The state court sentenced him to five to 20 years in prison. Pursuant to his plea agreement, Cannady testified against Darnell and Rush at their joint trial.

The State charged Darnell with seven counts and tried the case as a joint trial with co-defendant Rush, albeit with a separate jury for each defendant. Darnell's jury convicted him as charged: armed robbery, carjacking, first degree home invasion (with a weapon and with a person lawfully present in the dwelling), conspiracy to commit first degree home invasion, and receiving and concealing stolen property under $200. The state court sentenced Darnell to an effective prison

term of about 60 to 120 years, based in large part on its finding that he was a fourth time habitual offender. Darnell appealed, claiming that the police had coerced his confession (i.e., that the officers had withheld his anxiety medication until he confessed) and that the prosecution had produced insufficient evidence to convict him (i.e., that there had been no "breaking" and entering because Fulgiam had opened the door). In a consolidated appeal (with Rush), the Michigan Court of Appeals rejected Darnell's claims and affirmed his conviction. *Michigan v. Rush*, No. 312055, 2014 WL 1515270 (Mich. Ct. App. Apr. 17, 2014); *Michigan v. Rush*, 854 N.W.2d 734 (Mich. 2014). The federal courts subsequently denied Darnell's petition for habeas relief. *Rush v. Winn*, No. 15-cv-12921, 2016 WL 4045415 (E.D. Mich. July 28, 2016); *Rush v. Jackson*, No. 17-2300, 2018 WL 2015438 (6th Cir. Apr. 30, 2018).

## D. Trial

The State charged Rush with essentially the same counts with which it charged Darnell and tried the case in a joint trial but as mentioned, with separate juries for the two defendants. Attorney Brian Gagniuk represented Rush at trial. During voir dire Gagniuk exercised no challenges for cause, but during jury selection he exercised 11 of his 12 peremptory challenges. Before trial began, Gagniuk moved the court to exclude reference to Rush's two prior home-invasion convictions, and the court agreed. Gagniuk also moved to redact part of Rush's statement to the police about his stealing the iPhone from the car after visiting the pawnshop. But the court refused, finding that the entire statement was admissible.

Following the prosecutor's opening statement, Gagniuk gave an opening statement in which he emphasized that Rush had never touched a weapon, never touched Fulgiam, and never

7

touched the car—so Rush had nothing to do with the armed robbery or the carjacking.[7] Gagniuk also suggested that the crime was too poorly planned to qualify as a conspiracy, and urged the jurors to carefully consider each defendant separately.

The State's first witness was Floyd Fulgiam, who described the events of the home invasion but could not identify either defendant. Darnell's counsel cross examined Fulgiam, but Gagniuk did not. The State's next witness was Dandre Cannady, who testified pursuant to his plea agreement. Cannady identified Rush and Darnell in the courtroom and described the home invasion as above, beginning with Robinson's arriving in his car to pick them up at about 9:30 a.m. Cannady identified the victim, Fulgiam, in the courtroom. Cannady said he stood by the door while Darnell held Fulgiam down and threatened him with the razor blade and Robinson searched his pockets, while Rush searched the house. Using the keys that Robinson took from Fulgiam, Cannady took Fulgiam's car and drove off, though he abandoned it where Fulgiam found it later. Cannady explained that the other three then arrived in Robinson's car with a computer and the jewelry, which they were going to pawn. Cannady turned himself in three days later. Darnell's counsel cross examined Cannady, but Gagniuk did not.

The State's next witness was the clerk from the pawn shop who identified Rush and testified to Rush's pawning the jewelry. Neither defense counsel cross examined. Next, Sgt. Matt Fulks and Sgt. Cregg Hughes testified about Darnell's police questioning and confession. Although Rush and Gagniuk remained in the courtroom, Rush's jury was removed during this testimony. After swapping out the juries, Sgt. Hughes testified for Rush's jury about Rush's police

---

[7] The transcript for this day misidentifies Gagniuk as "Goze," but it was clearly Gagniuk speaking on behalf of his client, Rush. Eric Goze was Darnell's attorney and had given an opening statement for Darnell moments earlier. This is a consistent error in this transcript.

questioning and confession. When the prosecutor asked Sgt. Hughes about Rush's *Miranda* warnings, Gagniuk stipulated that Rush understood them and signed off on them. Sgt. Hughes explained that Rush initially denied any knowledge of the home invasion, so he brought Darnell in to speak with him, after which Rush confessed. The next sequence of testimony warrants quoting:

| | |
|---|---|
| Prosecutor: | At any time during the course of your interrogation of Darius Rush did he ever indicate to you that he did not wish to speak to you? |
| Sgt. Hughes: | He did not. |
| Prosecutor: | Did he ever indicate that he wanted to speak to an attorney? |
| Sgt. Hughes: | He did not. |
| Prosecutor: | Had he done so what would you have done? |
| Sgt. Hughes: | I would have stopped. |
| Gagniuk: | Your Honor, I'll interrupt and agree that [Rush] gave a statement. |
| Court: | A voluntary statement? |
| Gagniuk: | Yes. |
| Court: | Okay. Can you go forward, counsel? |
| Prosecutor: | Yes, and at this time I will move to admit [Rush's statement to the police] as exhibit five. |
| Gagniuk: | I wouldn't object. |

Sgt. Hughes then read Rush's entire statement into the record. In that statement, Rush admitted to participating in the home invasion and taking the jewelry, but denied taking the computer or the car, or ever touching Fulgiam. Furthermore, Rush had admitted to pawning the gold and breaking into the car afterwards to steal the iPhone. Gagniuk did not cross examine. The State's several other witnesses added no significant additional testimony.

At the close of the State's case, Gagniuk moved for a directed verdict on the armed robbery and carjacking counts, arguing that even as aiding and abetting the State had produced no evidence to convict Rush on those charges. The court denied the motion.

9

Because Darnell intended to testify, the court conducted a colloquy with him to ensure that he was doing so knowingly and intelligently. Rush was present and observed this colloquy. Moreover, Gagniuk moved the court to exclude Rush's jury from hearing Darnell's testimony, which the court denied, holding that both juries would hear the testimony from either (or both) testifying defendant(s), and that Gagniuk could cross examine.

Darnell testified that Christopher Alexander picked him up at his home at about 11:00 a.m. on January 9, and drove him to buy a car, but the car was full of bullet holes, so he decided not to buy it.[8] He testified that Robinson was the man selling the car, and that Rush was there too, along with a man named "James." He testified that he had never met or seen Cannady before his appearance in the interview room at the police station. And he testified that he had three prescription medicines for his "depression and anxiety," that he took them daily to allow him to cope and think clearly, and that upon his arrest on January 14, the police denied him his medication while they questioned him for hours. He claimed that he never confessed but that he eventually gave in to police "torture" and signed a statement without reading it. On cross examination, the State pressed him about Cannady, which led him to say that the four men who committed the home invasion were Robinson, Rush, Cannady, and James. The State also asked about his prior convictions, which led him to admit his prior conviction for felony assault with intent to rob. Gagniuk did not cross examine nor did he call any witnesses to testify for Rush. Both defenses rested.

After closing arguments to Darnell's jury, the court sent that jury home for the night, and then brought Rush's jury into the courtroom. In its closing, the State recounted the testimony

---

[8] The implication was that Robinson's car had bullet holes from Fulgiam's shooting it as they fled the home invasion. This fit Darnell's later contention that the four home invaders were Robinson, Rush, Cannady, and James.

against Rush, including his confession to the police, and urged the jury to find aiding and abetting on the armed robbery and carjacking counts. Gagniuk began his closing by saying: "Make Darius Rush pay for what Darius Rush put his hands on." Gagniuk conceded that Rush stole the jewelry but emphasized that Rush did not lay hands on Fulgiam or even know that Darnell had a weapon; did not engage in any planning or discussion that would be conspiracy; and did not go anywhere near the stolen car or its keys. He referred to Rush's statement to the police (that he took the jewelry) to emphasize the opposite: that Rush denied committing any physical assault, conspiracy, or carjacking. And he explained to the jury that he had asked no questions of any witness because all of the testimony was clear about this.[9]

Rush's jury deliberated for a little under two hours and convicted Rush of the nonviolent counts: home invasion, conspiracy to commit home invasion, and receiving and concealing stolen property under $200. But Rush's jury acquitted him of the violent counts of armed robbery, carjacking, and home invasion armed with a weapon. About two hours later, Darnell's jury convicted Darnell on all seven counts, both violent and nonviolent.

At his sentencing hearing a few weeks later, Rush attempted to express remorse, saying: "I really felt bad for what was brought upon the victim. I just couldn't stop what was did. I was just following the leader, and I do take full responsibilities [sic] for my actions." The sentencing judge was not persuaded, and said that Rush was only sorry that he was caught. The court sentenced

---

[9] Pause a moment to recognize Gagniuk's theory of the case and his defense strategy: to try to get Rush acquitted of the violent crimes by admitting the nonviolent crimes, despite the poor hand Gagniuk had been dealt, which included an accomplice testifying for the State, an incriminating testifying codefendant, Rush on camera pawning the stolen jewelry, Rush's confession, and Rush's severe criminal history. Gagniuk's opening and closing statements lay out his theory. The decision not to cross examine Fulgiam or Cannady is consistent with this approach, as their testimony supported his theory. And his decision (proactively) to admit Rush's confession is likewise consistent, as that put Rush's version (which matched Gagniuk's theory) before the jury without Rush's having to take the witness stand and reveal his criminal history under cross examination.

Rush to an effective prison term of 25-years-and-4-months to 80 years, using statutory maximums, consecutive sentences, and its finding that he was a third habitual offender.

### E. Direct Appeal

The Michigan Court of Appeals appointed Rush new counsel for appeal, Michael McCarthy, and consolidated Rush's appeal with Darnell's. In addition to challenging his sentence, Darnell also raised two challenges to his conviction: that his confession was coerced and that the evidence was insufficient. But, even fully aware of Darnell's claims, McCarthy did not raise any challenge to Rush's conviction; he challenged only Rush's sentence, claiming that Rush was not a habitual offender, and insisting that the sentence was "cruel and unusual" because it was "disproportionate" and included consecutive sentences. The appellate court rejected the latter claim, explaining:

> In sentencing [Rush], the trial court noted that [he] actively participated in the armed robbery of an elderly old man who was alone at the time of the robbery, and found that those circumstances warranted a significant sentence. . . . [Therefore, Rush] has not shown that the trial court erred by exercising its discretion to impose consecutive sentences in this case.

*Rush*, 2014 WL 1515270, at *5 (quotation marks and citations omitted). But the appellate court agreed that Rush was not a third habitual offender and vacated his sentence on that ground. *Id.*

It is noteworthy that after McCarthy filed his appellate brief, Rush timely filed his own *pro se* "Standard 4 brief." Pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4, a criminal defendant/appellant in Michigan who is represented by appointed counsel may also file a *pro se* supplemental Standard 4 brief, if he "insists that a particular claim or claims be raised on appeal against the advice of counsel."[10] The effect of a Standard 4 brief on later

---

[10] Ordinarily, counsel is responsible for all filings to the court on behalf of the defendant/appellant, and the court will refuse to accept (i.e., will return) any *pro se* filings because the defendant/appellant is represented.

claims of ineffective assistance of appellate counsel is not entirely clear. *See Michigan v. Good*, No. 349268, 2023 WL 2939146, at *3-4 (Mich. Ct. App. Apr. 13, 2023) (explaining that a "defendant who has supplemented appellate counsel's efforts with a Standard 4 brief does not per se waive [his] ability to later raise ineffective assistance of appellate counsel claims" because he "continue[d] to rely on appellate counsel, and [] only file[d] a Standard 4 brief to *supplement*, not *supplant*, appellate counsel's arguments"). *But see Michigan v. Lopez*, 854 N.W.2d 205, 211 (Mich. Ct. App. 2014) ("[T]o the extent that [a] defendant argues that appellate counsel should have raised the issue of trial counsel being ineffective, because [the] defendant raise[d] this issue in his Standard 4 brief, any possible error committed by his appellate counsel was cured.").

In his Standard 4 brief, Rush raised several claims concerning his conviction and sentence, including an odd claim of appellate ineffective assistance of counsel (IAC), accusing McCarthy of "allowing false testimony to stand at the Preliminary Examination of Mr. Rush" (albeit without identifying the testifying witness or the specific testimony).[11] The Michigan appellate court addressed this Standard 4 brief in its opinion, explaining that Rush "attempts to raise several issues, none of which are included in a statement of the questions presented and none of which are sufficiently supported by citation to the record or authority. These claims are deemed abandoned; thus, we need not consider them." *Rush*, 2014 WL 1515270, at *6.

---

[11] Construing liberally Rush's 21-page Standard 4 brief, he claimed: (1) the trial court improperly admitted Robinson's statement to the police; (2) the court did not allow some unspecified "newly discovered evidence pertaining to witness statement on credibility"; (3) appellate IAC for "allowing false testimony to stand at the Preliminary Examination of Mr. Rush"; (4) the court improperly admitted Rush's confession because it was not voluntary, because (a) he "was not advised of his Miranda rights," (b) "on several occasions [he] sed that he wanted a lawyer and that he did not whant to talk to them (detective's) any longer [sic]," and (c) he "had been smoking Marijuana"; (5) the evidence was insufficient to prove home invasion; (6) allowing convictions for both home invasion and stolen property violated double jeopardy; (7) his sentence was above the statutory limits; (8) the prosecutor used "an impermissible and suggestive pre-trial, one-on-one identification procedure"; (9) trial IAC for "failure to object to or move to suppress the identification evidence"; and (10) trial IAC for failure to object to the police officer's testimony, "which amounted to an improper expression of opion [sic] of [Rush's] guilt."

At his resentencing hearing in December 2014, Rush spoke to the court on the record, first reading a letter that he had written to the victim, Fulgiam, then addressing the judge:

> I wrote this because, you know, it's to the victim. You know, even though it happened a long time ago, I feel as though I still have to apologize because I'm feeling my last apology wasn't sincere enough. And I just came from the community trying to get back out.
>
> But it says: 'Dear Victim, I would like to apologize to you for what took place January 9th of 2012. I came to your home, violated your personal space, and took personal belongings. What I did to you is very wrong, and I really regret the actions I made towards you.
>
> I was young and dumb, only thinking about myself. I was just acting and not thinking about other people's feelings. I went about trying to support my habit the wrong way, when all I had to do was ask or work, work for what I want. But, you know, that never came to realization until I was sent to prison for what I did.
>
> What I did to you was wrong, and you probably won't forgive, but all I can do is ask so I could be at peace with myself. I have a lot of elderly family members, and wouldn't want what I did to -- I have a lot of elderly family members, and wouldn't want what I did to you to happen to them.
>
> Again, I'm really sorry - - I'm really sorry, and I ask you for forgiveness.

Following this, Rush addressed the judge, saying, in relevant part:

> Your Honor, I really messed up, and I know the crime I committed was a serious crime and it carries a lot of prison time. But like I said earlier, I was stuck in those young and dumb ways at the time, not thinking before I acted.

The trial court resentenced Rush under the corrected guidelines calculation.

Rush appealed again with new counsel and the appellate court remanded for the trial court to consider whether another resentencing was warranted.[12] *Michigan v. Rush*, No. 325194, 2016 WL 1680742 (Mich. Ct. App. Apr. 26, 2016). On remand, Rush's new counsel appeared before a new trial judge who refused to hold another resentencing, and reimposed the prior sentence,

---

[12] In this second direct appeal, Rush's new appellate attorney (Lee Somerville) raised two issues: (1) Rush was due 15 additional days of credit for time served, and (2) the trial court applied certain sentencing factors (vulnerability of the victim and pattern of criminal activity) that were facts not found by the jury. The appellate court agreed with both claims and remanded for the trial court to complete "the ministerial task" of correcting his time-served credit and to determine whether resentencing was warranted. *Rush*, 2016 WL 1680742, at *4-5.

14

effectively 19-years-4-months to 40 years. Rush appealed again, but this time the appellate court affirmed.[13]  *Michigan v. Rush*, No. 334740, 2018 WL 1020305 (Mich. Ct. App. Feb. 22, 2018).

In the meantime, Rush had filed a plethora of letters and *pro se* motions with the appellate court, which had refused them because Rush was represented by counsel. On June 2, 2017, Rush filed, *pro se*, a new (second) Standard 4 brief, raising three claims (i.e., insufficient evidence of conspiracy, trial IAC based on *Cronic*, and trial IAC for Gagniuk's conceding guilt on the nonviolent counts), with an accompanying "Motion to Remand for a Ginther Hearing" to assess different trial-IAC claims (i.e., failed to challenge the voluntariness of his confession, refused to let him testify, and conceded guilt on the nonviolent counts). Neither this Standard 4 brief nor this motion made any reference to appellate IAC. The Michigan appellate court addressed the brief: "The issues defendant now raises in his Standard 4 brief are outside the scope of this Court's remand order, and accordingly are not reviewable in this appeal." *Rush*, 2018 WL 1020305, at *3.

## F. State Post-Conviction Proceedings

In April 2018, in the Michigan trial court, Rush filed a pro se motion for post-conviction relief from judgment pursuant to Michigan Court Rule (M.C.R.) § 6.508(D),[14] claiming IAC by his trial and appellate counsel.[15]  Rush argued that Gagniuk failed to subject the State's case to any

---

[13] In this third direct appeal, Rush's new appellate attorney (Neil Leithauser) raised a single issue, claiming that because the previous sentence was unreasonable and disproportionate, the trial court abused its discretion by refusing to conduct a *de novo* resentencing.

[14] Concurrently, Rush filed a "Motion for Evidentiary Hearing" through which he proposed to introduce evidence to support his M.C.R. § 6.508(D) claims. This motion contains a single mention of appellate IAC, stating that: "6. A hearing must also be held to determine why appellate counsel failed to raise any of these issues [discussed in this motion] or the issues presented in Rush's motion for relief from judgment." In an affidavit attached to the motion, Rush stated: "When I was appointed appellate counsel Michael J. McCarthy, I told him everything that happened and what issues the [prison] legal writer advised me to tell my attorney to raise on appeal. [McCarthy] told me I had very strong issues and that he would present them on appeal. . . . On October 13, 2014, I received a copy of McCarthy's brief and noticed he only raised one sentencing issue. He never provided me with any transcripts or other paperwork and never told me how to prepare a Standard 4 Brief."

[15] Rush raised two other nonviable issues, which the court rejected.

meaningful adversarial testing, specifically asserting that he (1) did not move for directed verdict on the conspiracy count, (2) conceded Rush's guilt to the nonviolent charges without Rush's approval, (3) prevented Rush from testifying, (4) presented no defense to the nonviolent charges, (5) did not cross-examine any witnesses, and (6) did not suppress the false and fabricated confession or cross-examine Sgt. Hughes about it. The court found this to be trial strategy not deficient performance, and that Rush would have been convicted even without these alleged errors, so Rush could not show prejudice.

It bears recognizing that, in all meaningful respects, Rush's contention was that Gagniuk should have followed the same path taken by Darnell's counsel (Eric Goze) in defending the case: that is, he should have challenged the voluntariness of Rush's confession, he should have denied Rush's guilt on all of the charges, he should have critically cross examined each of the witnesses, and he should have had Rush testify on his own behalf. But Darnell's jury convicted Darnell on all counts, thus undermining Rush's premise that that this strategy would have been successful.

In his motion, Rush also argued appellate IAC based on his appellate counsel's (McCarthy's) alleged refusal "to raise issues which would have resulted in a reversal of his conviction." The court found that McCarthy had successfully reduced Rush's sentence via appeal, thus demonstrating that appellate counsel's performance had not been wholly deficient. And the court found that Rush could not show prejudice from the failure to raise the trial-counsel-IAC claims. On February 4, 2019, the court denied Rush's motion.

Specifically, the court laid out the Michigan court rules for post-conviction relief, including that: "The court may not grant relief to the defendant if the motion . . . alleges grounds for relief . . . which could have been raised on appeal from the conviction and sentence . . . unless the defendant demonstrates . . . good cause for failure to raise such grounds on appeal[.]" M.C.R.

§ 6.508(D)(3)(a). And it concluded its opinion by holding that "all of [Rush]'s arguments fail to meet the heavy burden under MCR 6.508(D)(3)(a) good cause and actual prejudice. As a consequence of [Rush]'s failure to show good cause or prejudice as required by the court rules, his motion for relief of judgment must fail." So, despite assessing the merits of Rush's claims, the Michigan court denied Rush's post-conviction motion on state procedural grounds (i.e., procedural default). The court also denied Rush's request for an evidentiary hearing.

Rush sought leave to appeal to the Michigan Court of Appeals, which denied leave. Rush then sought leave to appeal to the Michigan Supreme Court, which also denied leave. *See Michigan v. Rush*, 941 N.W.2d 663 (Mich. 2020). Therefore, the Michigan trial court's February 2019 opinion is the final state court judgment on the merits for federal habeas purposes.

## II. FEDERAL HABEAS PROCEEDINGS

### A. Petition and Hearing

Rush filed a *pro se* federal habeas petition (later amended), pursuant to 28 U.S.C. § 2254, claiming actual innocence and: (1) trial counsel IAC for failing to suppress the coerced, false, and fabricated confession; (2) trial counsel IAC pursuant to *Cronic* for failing to cross-examine any witnesses, particularly about that false confession; (3) trial counsel IAC for conceding Rush's guilt on the nonviolent charges; (4) trial counsel IAC for preventing Rush from testifying; and (5) appellate counsel IAC for refusing Rush's demands to raise these IAC claims on direct

appeal.[16]  Rush also requested an evidentiary hearing.  The district court appointed counsel, who filed a supplemental brief restating Rush's petition and clarifying his claims.[17]

The district court held that Rush was "entitled to an evidentiary hearing on his constructive denial of [trial] counsel claim" and his appellate IAC claim.  *Rush v. Winn*, No. 2:20-cv-11540, 2021 WL 1904498, at *4-5 (E.D. Mich. May 12, 2021).  By asserting that the Michigan trial court had "simply misconstrued or overlooked" Rush's *actual* claim, so that "there [we]re simply no results, let alone reasoning, to which this [district] court c[ould] defer," the court held that Rush was entitled to proceed *de novo*.  *Id*. at *3 (quotation marks and citations omitted).  In this way, the court attempted to justify an evidentiary hearing despite admitting that 28 U.S.C. § 2254(e)(2) and *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), generally forbid federal habeas courts from holding such a hearing.  *See also Shinn v. Ramirez*, 596 U.S. 366, 371, 381 (2022).

Specifically, in ruling on Rush's M.C.R. § 6.508(D) motion, the Michigan court had analyzed Rush's claims under *Strickland* and found neither deficient performance nor prejudice.  But, according to the district court, Rush's *actual* M.C.R. § 6.508(D) claim—which the state court misconstrued or overlooked—was *not* a *Strickland* claim, but a claim that Gagniuk had altogether, entirely, and completely failed to challenge the State's case or provide Rush a defense, in violation of *United States v. Cronic*, 466 U.S. 648 (1984), and *Bell v. Cone*, 535 U.S. 685 (2002).[18]

---

[16] On the record below, it is questionable whether Rush presented standalone *Strickland* claims or if all of his trial-counsel-IAC claims are subsumed into his constructive-denial claim based on *Cronic*.  Regardless, the State does not argue that Rush failed to bring independent *Strickland* claims, but rather appears to concede that Rush presents claims under both *Cronic* and *Strickland*.  Consequently, that is how we review them here.

[17] The district court appointed Christopher McGrath, who filed the supplemental brief in the district court.  When McGrath withdrew, the court appointed Carole Stanyar, who represented Rush at the hearing and thereafter.  On appeal here, Stanyar withdrew and this court appointed Kevin Schad, who briefed and argued this appeal.

[18] As for this claim, it bears recognizing that Gagniuk crafted and applied an identifiable and articulable defense theory and strategy, participated in jury selection, made pretrial motions (one successful), made an opening argument, moved for directed verdict at the close of the State's case, moved to exclude Rush's jury from hearing

Consequently, the district court held that Rush was entitled to an evidentiary hearing on his *Cronic* claim. *Rush*, 2021 WL 1904498, at \*4. And, without explanation, the court added that he was also entitled to an evidentiary hearing to "show that he received ineffective assistance of appellate counsel, [in order to] excuse his procedural default for failing to raise his underlying ineffective assistance of trial counsel claims on his direct appeal in the state courts." *Id.* at \*5.

At the hearing, Rush called Gagniuk to testify, and Rush testified himself. Rush did not call his appellate counsel, McCarthy, to testify and there was, in fact, no inquiry into Rush's claim of appellate IAC. Gagniuk testified that he had no present recollection of any conversations with Rush about the circumstances of Rush's confession, about Rush's testifying at trial, or about the overall strategy. Nor did he recollect his specific trial conduct. On cross examination, Gagniuk testified that he had been a criminal defense attorney for ten years at the time of Rush's trial and had tried numerous jury trials. He testified that his strategy, as he recalled from reviewing his file, "was to beat the armed robbery and the carjacking"; he testified about his ordinary practice and habits; and he said that he had more than once successfully admitted guilt to a lower offense to avoid a higher offense. And he testified that his ordinary practice is to always explain this strategy fully to the client. Regarding the allegedly coerced false confession, Gagniuk testified:

| Question: | Would you have - - would you have taken certain steps if your client had told you that he was threatened during the time when he gave a confession? |
|---|---|
| Gagniuk: | Yeah, I would have. |
| Question: | Either by a police officer or his uncle or anybody? |
| Gagniuk: | I would further investigate it at least for starters, yeah. |
| Question: | You wouldn't just ignore that information? |

---

Darnell's testimony, made a closing argument—during which he explained that he had questioned no witnesses because their testimony supported his theory—and successfully persuaded the jury to acquit Rush on the violent-crime charges. There is no honest or legitimate way to say that Gagniuk was altogether, entirely, and completely absent.

Gagniuk:      No, no.

As for the *Cronic* claim, which was the purported basis for the hearing, Gagniuk testified on cross examination that he was never asleep or absent, and that he actively participated in the trial (as was already evident from the trial transcript).

Next, Rush testified and told two stories, insisting in both that he is actually innocent— claiming that he did not steal any jewelry from Fulgiam or ever even go to Fulgiam's house; he got the jewelry from Robinson and did not know it was stolen. In the first story, denying the home invasion, Rush said he went to Robinson's house at about 10:30 a.m. looking for a ride to an Auto Zone store and, in exchange for Robinson's driving him there, he bought Robinson gas. But while he was in the gas station paying, Robinson got a call to go do something else, so Robinson dropped him off. Rush went home. About an hour later, Robinson telephoned Rush at home, calling him back to his house. Robinson repaid Rush the gas money and offered to sell him some jewelry, which Rush bought for $100. Rush, Alexander, and Darnell then went to the pawnshop to sell the jewelry (for $128) because Rush needed money to buy car parts at Auto Zone. A day or two later, Cannady told him that he and Robinson had stolen the jewelry from a home. While this story may be facially plausible, it contradicts the stories Cannady and Darnell told at trial (and presumably Robinson told the police). Also recall that at sentencing (and again at resentencing), Rush voluntarily confessed and expressed remorse. So, in the totality of the evidence, this story defies belief and sabotages Rush's credibility.

Rush's second story concerned his confession. Rush said that police took him to the station where he was immediately fingerprinted, strip searched, and photographed. Rush testified that when Sgt. Hughes began the questioning, asking about the home invasion, Rush said:

I'm like 'I don't know nothing about no home invasion or no robbery. I ain't had nothing to do with it, and since I've been accused of it, I want a lawyer.'

He [Sgt. Hughes] gave me the constitutional right form and said since I asked for an attorney I should sign this. So when I get the form and I looked at it, I seen that I had, you know, a right to an attorney on there. So I initialed and I signed it believing I was asserting my rights because after I signed it he told me I didn't need no lawyer, and he got up and he left out the room. And when he left out, I'm thinking the interrogation over.

So when he come back, he come back with my uncle [Darnell]. I'm like, 'Look, man, I don't know what you want or what you trying to do, but I don't want to talk to any one of you all,' but he ignored me.

Rush continued the story, testifying about the interaction with Darnell when they were alone:

[Darnell] said, 'Nephew, I'm in a real f--ked up situation right now, and you my only way out of it.'

I'm like, 'What you mean?'

He like, 'Man, they want you to admit to this home invasion so they can end this case.' He like, 'And I really need you to admit to it so I can get the deal that they offered me, man, because I can't go back to prison.'

. . .

I told him that I ain't know what he was talking about, and I wasn't admitting to nothing.

And he got real mad at me and told me he was going to beat the s--t out of me if I don't start telling these people what they want to hear because I wasn't going to f--k up his chances of getting out of here so - -

According to Rush, Darnell also persuaded him that he would receive only probation, or at most a minimal sentence to be served in the county jail, thus further compelling him to falsely confess.

Rush concluded this story by insisting that he confessed only because of "[w]hat Darnell had said and done," and that the confession was not true. He said Sgt. Hughes made up the story in the

21

statement. In fact, Rush insisted that he did not even read it and did not learn what was said in it until he received the trial transcripts for his appeal, well after trial.[19]

About three weeks after the evidentiary hearing, Rush's counsel moved to amend the habeas petition to add a claim that the police continued to interrogate Rush after he requested counsel, in violation of *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that when an accused invokes his right to counsel during a custodial interrogation, questioning must cease until counsel is made available, unless the accused initiates further communications). The State said that claim was procedurally defaulted, but the district court granted the motion anyway.

Ultimately, the district court granted the petition and ordered the State to give Rush a new trial or release him. *Rush v. Douglas*, 2023 WL 4874774 (E.D. Mich. July 31, 2023).

---

[19] Because the district court found this story credible and relied on it to grant Rush habeas relief, a few things about this story warrant mention. Of course, our view of the evidence is irrelevant under a proper AEDPA review, but this assessment places the district court's fact findings, analysis, and conclusions in proper context.

One, Rush fully insisted on his claim that he is actually innocent; that this was not merely a coerced confession, but a *false* confession *fabricated* by Sgt. Hughes. But, in the totality of the evidence, his claim of actual innocence defies belief. Two, even taking this story at face value, Darnell's purported motive for coercing Rush into a false confession was to get the "deal" from the State that he desperately needed, but after Rush capitulated, Darnell did not get any deal; Darnell went to trial. Three, at trial, Sgt. Huges testified that Rush gave the statement voluntarily, that Rush never indicated that he did not want to speak, and that Rush never asked for an attorney. Four, on cross examination, the State introduced a notarized affidavit (dated May 24, 2017) that Rush had submitted to the Michigan courts in 2017, in which Rush swore, subject to perjury, that Darnell did not pressure him. Thus, as of 2017, Rush's story was that Darnell encouraged him to talk but he (Rush) refused, so Sgt. Hughes removed Darnell from the room. According to that sworn testimony, subject to prosecution for perjury, Darnell never threatened or coerced Rush. Finally, it is passing strange that Sgt. Hughes would concoct a false confession needlessly favorable to Rush, i.e., in which Rush limited his participation in the crime by specifically denying that he touched Fulgiam or his car and asserting that Darnell alone assaulted Fulgiam. For these reasons, as well as basic common sense, this new story about Darnell's coercion defies belief.

Similarly, Rush's contention that he told Gagniuk this story of coercion (repeatedly) and that Gagniuk refused to take any action to investigate or challenge the confession in any way likewise defies belief. According to Rush, Gagniuk was well aware of this coercion and that the confession was fabricated (i.e., Gagniuk knew that Rush was actually innocent), but nonetheless proactively stipulated that the confession was voluntary. But recall that Gagniuk testified that he would not have ignored a claim that the confession was coerced and false; if Rush had told him that, he would have investigated.

**B. The District Court's Ruling**

In its ruling, the district court acknowledged Gagniuk's performance (e.g., jury selection, limine and directed-verdict motions, opening and closing arguments) and held that Rush could not state a viable *Cronic* claim. Recall that the court's sole justification for the evidentiary hearing was the *Cronic* claim, so this recognition that the *Cronic* claim was untenable—for reasons that were clear from the record and thus fully known when the court ordered the hearing—necessarily destroyed the court's justification for the hearing and the admission of that evidence. But the court did not acknowledge this aspect of the ruling and simply moved on to analyze Rush's claims under *Strickland*, using that evidence.

Next, the court held that Rush had preserved the *Edwards* claim by raising it to the Michigan Supreme Court in his *pro se* application for leave to appeal the denial of his M.C.R. § 6.508(D) motion because, in a passage describing Darnell's alleged coercion, Rush posed a question: "4. Did Mr. Rush later assert his Right to Counsel or to be silent?" *Id.* at *6 (citing R. 18-17, PgID 2303). Emphasizing and relying on the relaxed standards for *pro se* litigants, the district court said this was sufficient to raise the *Edwards* claim to the Michigan courts. *Id*.

Take a moment to appreciate this. During his trial testimony, Sgt. Hughes testified that Rush never asked for counsel or declined to talk. When Gagniuk proactively interjected to stipulate that Rush's confession was voluntary, Rush sat there next to him without protest. At his original sentencing hearing, Rush made a statement to the court, but he did not mention this issue in any way—he confessed and expressed remorse. His appellate counsel (McCarthy) did not raise this on appeal, even though Darnell raised a coerced confession claim in that consolidated appeal. To be sure, Rush alluded to this in one of his ten broad claims in his Standard 4 brief, *see* fn. 11,

*supra*, which the state court rejected as unsupported by record citation or legal authority.[20] Notably, Rush did not raise this *Edwards* claim to the trial court in his M.C.R. § 6.508(D) motion or to the Michigan Court of Appeals thereafter. In fact, Rush swore out an affidavit (dated June 28, 2019) and attached it to his motions for leave to appeal, but that affidavit contained no claim that Rush had ever requested counsel.[21] In his motion to the Michigan Supreme Court, he did not assert that he ever requested counsel, nor did he cite *Edwards* or argue any *Edwards* claim or theory. Rather, in his description of Darnell's alleged coercion, Rush offered that a court should consider, among other things, whether he "later assert[ed] his right to Counsel." Finally, Rush did not raise any *Edwards* theory in his habeas petition, a fact made most evident by his appointed counsel's subsequent (after the hearing) motion to amend the petition to add the *Edwards* claim.

---

[20] Even if we accept that Rush's first Standard 4 brief was sufficient to inform the Michigan appellate court that Rush had "on several occations [] sed that he wanted a lawyer and that he did not whant to talk to them (detectives) any longer [sic]," this factual assertion alone was not enough to properly raise an *Edwards* claim to the Michigan courts. In order to have properly exhausted a claim, the petitioner must have presented the substance of that claim to the state courts as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citation omitted). The petitioner must have presented "both the *legal* and factual basis" for the claim. *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015) (citation omitted); *Taylor v. Valentine*, No. 20-5418, 2021 WL 8153646, at *2 (6th Cir. Sept. 16, 2021).

[21] On appeal here, Rush points to a different affidavit (dated May 24, 2017), in which he attested that he told Sgt. Hughes during his questioning that he "would like a lawyer and did not wish to talk any longer." Rush contends that this is proof that he demanded a lawyer—and that he raised an *Edwards* claim in the Standard 4 brief to the Michigan Court of Appeals to which he attached that affidavit.

That Standard 4 brief, however, does not contain any *Edwards* claim or *Edwards*-based theory. Moreover, in that affidavit (May 24, 2017), Rush presents a story in which Darnell encouraged him to talk to the police but when he refused, Sgt. Hughes removed Darnell from the room and Darnell never coerced him. Putting these two affidavits side by side, we have Rush (subject to prosecution for perjury) attesting both that he demanded an attorney and Darnell never threatened or coerced him (May 24, 2017), and contrarily offering a story in which he never requested an attorney and Darnell *did* threaten and coerce him (June 28, 2019).

The district court found Rush credible and relied on that finding to grant Rush habeas relief. It is impossible, however, to find Rush credible based on the record before us. As merely one example, rather than proving Rush's claims, these affidavits suggest that Rush cannot keep his stories straight. But, as already mentioned, our view of the evidence (including Rush's credibility) is irrelevant under a proper AEDPA review, and this discussion is included merely to place the district court's fact findings, determinations, and conclusions in proper context.

But the district court still held that Rush raised the *Edwards* claim in the state court, thus exhausting it.

So, beginning with Rush's *Edwards* claim (as a facet of his trial-IAC claim), the district court recounted Rush's stories as told during his hearing testimony, and announced that it "finds that [Rush] was credible regarding the circumstances of the interrogation, his discussions with [Gagniuk] concerning the involuntariness of the waiver of his *Miranda* rights and that his confession was coerced, and his desire to have [Gagniuk] move to suppress the confession." *Id.* at *11.[22] The district court faulted the State for failing to call any witnesses at the hearing to rebut Rush's testimony on this story—but recognize that the State had no reason to call such witnesses and, indeed calling them might have been inappropriate or impermissible, given that the hearing was supposed to be about a *Cronic* claim, and Rush's attorney did not even add the *Edwards* claim until his amended petition three weeks *after* the hearing. The district court rejected Gagniuk's testimony as equivocal and flatly rejected Sgt. Hughes's trial testimony (i.e., that Rush had never requested an attorney or refused to speak with officers) because Sgt. Hughes did not testify at the evidentiary hearing. *Id.*

On Rush's false-confession claim, the district court believed Rush's story that Darnell had coerced the false confession by threat of physical violence and promises of judicial leniency (probation or minimal jail time), which rendered the confession involuntary. *Id.* at *12. As with Rush's *Edwards* claim, the district court believed Rush's story that he demanded an attorney and exercised his right to remain silent but found that Sgt. Hughes sent Darnell in—as an agent of the

---

[22] *But see* fn. 19, *supra.*

police—to coerce Rush to give up his Fifth Amendment rights and confess.[23]  *Id.*  And the district court believed Rush's story that he told Gagniuk all of this, whereupon the district court concluded that Gagniuk "was deficient for failing to move to suppress an obviously coerced confession."  *Id.* As for prejudice, the district court offered this rationale:

> [Rush] was also prejudiced by counsel's failure to move to suppress the confession. The main evidence against [Rush] was Mr. Cannady, a co-defendant,[24] who testified against him in exchange for a plea bargain. This makes the co-defendant's testimony somewhat suspect, as he had a motive to lie in order to obtain leniency.

*Id.* at \*13.  But this is not a court's ordinary view of witness testimony pursuant to a plea bargain. Obviously, defense attorneys can and do raise such a contention to a jury, but most courts are aware—and routinely instruct juries—that the witness has sworn to tell the truth and that any promise in a plea bargain is conditioned on his telling the truth, not on his lying.[25]  The court

---

[23] Because "coercion" in the context of a confession requires coercive *police* activity, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), the district court decided for itself that "[Darnell] was acting as an agent for the police when he was sent into the interrogation room by Detective Hughes to force [Rush] to give up his Fifth Amendment rights and confess." *Rush*, 2023 WL 4874774, at \*12.  Obviously, a determination that Darnell was acting as an agent for the police would require a far more exhaustive inquiry and analysis than the district court's conclusory statement here. *See*, *e.g.*, *United States v. Sykes*, 65 F.4th 867, 876-77 (6th Cir. 2023).  Even if we accepted Rush's claims that Darnell threatened him into a false confession, Rush has not even alleged—much less proven with evidence—that Darnell did so as an "agent of the police."  According to Rush's current story, Darnell did so for his own personal benefit.

[24] Technically, Cannady was not a "co-defendant."  Cannady was an accomplice who testified against Rush as a State's witness; he had already pled guilty and been convicted at the time of Rush's trial.

[25] At trial, the prosecutor began his direct examination of Cannady by proffering Cannady's plea agreement for his review, and Cannady testified that he had pled guilty to reduced charges and agreed to testify against Rush and Darnell in exchange for a sentence of five to 20 years.  Then this exchange happened:

| Prosecutor: | And as part of that agreement you understand that you had to come and testify about what happened? |
|---|---|
| Cannady: | Yes. |
| Prosecutor: | And that if you didn't tell the truth there wouldn't be a deal, right? |
| Cannady: | [Nodding] |
| Prosecutor: | Right?  And that you would be subject to a trial and everything else? |
| Cannady: | Yes. |
| Prosecutor: | Okay.  And you are here to do that today? |

offered two additional thoughts, without explanation or support, as proof of Gagniuk's IAC: (1) "there is a significant likelihood that the confession would have been suppressed had a motion to suppress been filed," and (2) "the evidence in this case was not strong." *Id.*

In finding appellate IAC, the district court accepted Rush's claim that he told McCarthy (in fact, told each of his three appellate attorneys) about the *Edwards* violation and Darnell's coercion, and that Gagniuk had known of it and done nothing. Specifically, the district court found that Rush had "advised appellate counsel that his confession had been coerced, that trial counsel had been ineffective, and asked that [appellate] counsel raise these issues on appeal; but appellate counsel only raised a single sentencing issue." *Id*. at *14. But, as mentioned, Rush did not call these counsel to testify at the hearing, so the district court had nothing from any of them when it determined that they inexplicably rejected Rush's demands to raise these issues on appeal. Again, this approach places unprecedented power in a petitioner's testimony on habeas review.

Finally, the district court held that Gagniuk committed IAC by conceding Rush's guilt on the home-invasion charge because—according to Rush—Gagniuk did not consult with Rush about this strategy beforehand. Because Rush had rejected a plea offer and chosen to go to trial, the

| Cannady: | Yes. |
| Prosecutor: | And you're here to tell the truth? |
| Cannady: | Yes. |
| Darnell's attorney: | Judge I would object as to A he's already taken an oath number two - - |
| Court: | What is the objection? |
| Darnell's attorney: | Well one things it's been asked and answered. |
| Court: | What's that? |
| Darnell's attorney: | I'm sorry. Your Honor, it's irrelevant as to if he was here to tell the truth he took an oath to swear to tell the truth. |

The district court here, however, inexplicably relied on its belief that Cannady was lying.

court said he was unlikely to have agreed to such a strategy. *Id.* The court added that appellate counsel was ineffective because the error was apparent from the trial court record. *Id.*

The district court acknowledged that Rush procedurally defaulted *all* of his claims by failing to raise them on direct appeal. *Id.* at *7 ("Petitioner's claims are procedurally defaulted."). To overcome this, the district court held that Rush had established cause and prejudice to excuse his default by proving that his appellate counsel (McCarthy) committed IAC. *Id.* at *7-8. Even though McCarthy had successfully challenged Rush's sentence, ultimately reducing it by several years, the district court held that McCarthy committed appellate IAC because—in the court's view—the trial-court-IAC claims were not just "clearly stronger than the single sentencing issue [that McCarthy did] raise[]," but were "clearly dead-bang winners," meaning they were "obvious from the trial record" and would certainly have "resulted in a reversal on appeal." *Id.* at *8.

\* \* \* \* \*

The district court granted Rush's habeas petition, vacated his Michigan state-court convictions, and ordered the State to grant him a new trial within 90 days or else release him. The State appeals, raising several claims of error, but we need reach only the procedural default.

### III. AEDPA

This is a § 2254 habeas petition, so we review the district court's decision de novo and the Michigan court's judgment under AEDPA deference. Under AEDPA, a federal court can overturn a state-court conviction if it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

To prevail under the "contrary to" clause, a petitioner must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law"

or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). This case does not involve a contrary-to-clause scenario.[26]

To prevail under the "unreasonable application" clause, a petitioner must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of the [petitioner's] case." *Id*. at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 410). It is not enough that "the federal habeas court might conclude in its independent judgment that the state court applied clearly established federal law erroneously or incorrectly." *Gagne v. Booker*, 680 F.3d 493, 513 (6th Cir. 2012) (en banc) (internal quotation marks, editorial marks, and citation omitted). The relevant state-court decision must have applied clearly established federal law in an objectively unreasonable manner, *Renico*, 559 U.S. at 773, such that its decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

---

[26] To be sure, in his brief, Rush makes an odd argument that the Michigan trial court's analysis of his appellate-IAC claim in its February 4, 2019, opinion denying his post-conviction motion is *contrary to* established Supreme Court law. *See* Appellee Br. at 25-29. A plain reading of that opinion shows that the Michigan court applied the *Strickland* standard (deficient performance and prejudice) to Rush's appellate-IAC claim.

But Rush reads it differently and asserts, based on his reading, that the Michigan "court believed that if appellate counsel actually raised an issue that obtained relief, that by law, Rush could not show prejudice for failing to raise other issues on appeal," and he insists that "the Supreme Court and this Court's precedents say otherwise." Appellee Br. at 27. Rush then cited an unpublished Sixth Circuit opinion. He did not cite any Supreme Court opinion. Therefore, even if Rush's reading had been the Michigan court's actual reasoning—which it clearly was not—Rush has not identified any Supreme Court precedent that would allow us to conduct a "contrary to" analysis.

## IV.  PROCEDURAL DEFAULT

A federal court may grant habeas relief from a state court conviction only if the petitioner is being held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Trevino v. Thaler*, 569 U.S. 413, 421 (2013).  Our review is limited by our deference to state-court judgments that rest upon independent and adequate state-procedural grounds, *Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991), and by the congressional mandate that petitioners must exhaust all available state remedies before pursing federal habeas relief, § 2254(b)(1)(A); *see Johnson v. Bauman*, 27 F.4th 384, 388 (6th Cir. 2022).  Therefore, we normally decline to exercise habeas review when a petitioner fails to raise a claim in state court and cannot do so now due to a state procedural rule.  *Coleman*, 501 U.S. at 731-32.  Such a claim is considered "procedurally defaulted" and principles of comity, finality, and federalism counsel against disturbing a state-court conviction without the state courts having had the opportunity to first address the claimed error.  *Id.* at 730, 750; *Davila v. Davis*, 582 U.S. 521, 527 (2017).

To properly exhaust a claim, the petitioner must have presented the substance of that claim to the state courts as a federal constitutional claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citation omitted).  The petitioner must have presented "both the *legal* and factual basis" for the claim.  *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015) (citation omitted); *Taylor v. Valentine*, No. 20-5418, 2021 WL 8153646, at *2 (6th Cir. Sept. 16, 2021).

Rush did not present any of his current claims on direct appeal, as required by Michigan law, meaning that he did not exhaust his claims in the Michigan courts, and they are procedurally

defaulted.[27]  *Rush*, 2023 WL 4874774, at \*7-8 (acknowledging the procedural default).  To overcome such a procedural default, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Rush argues that his appellate counsel's (McCarthy's) failure to raise the claims on direct appeal was appellate IAC that satisfies the cause-and-prejudice excuse. *See Chase v. MaCauley*, 971 F.3d 582, 592 (6th Cir. 2020).  And "[w]e generally require, in this context, that the habeas petitioner raise [that] ineffective-assistance-of-counsel claim to the state court." *Id.*

The district court held that McCarthy committed appellate IAC by failing to raise the trial-court-IAC claims on direct appeal.  The State says the district court failed to give the Michigan court's judgment its proper AEDPA deference, misapplied the law about appellate IAC, and reached the wrong conclusion.  Here, Rush argues that McCarthy committed IAC because these were "dead bang winners" that would have certainly prevailed on appeal.  While the Sixth Circuit has not explicitly adopted the "dead bang winner" terminology,[28] we can construe it as a synonym for "plainly stronger" in the ordinary appellate-IAC rule.  "Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed." *Davila*, 582 U.S. at 533.  "Declining to raise a claim on appeal, therefore, is not deficient

---

[27]Rush has no further post-conviction relief available either. *See* M.C.R. § 6.502(G)(1) (criminal defendants are entitled to file "one and only one motion for relief from judgment . . . with regard to a conviction").

[28] Rush cites a dissent for this proposition as if it were the law, without acknowledging that he is citing a dissent. *See* Appellee Br. at 26 (citing *Moss v. Miniard*, 62 F.4th 1002, 1022-23 (6th Cir. 2023) (Cole, J., dissenting)). Petitioners often use the "dead bang winner" terminology in appellate-IAC arguments, and other Circuits sometimes use that terminology as well, but that is not the law of the Sixth Circuit, at least not explicitly.  The district court used this "dead bang winner" terminology, but did not cite Sixth Circuit precedent, instead citing another district court opinion and an Eleventh Circuit opinion. *See Rush*, 2023 WL 4874774, at \*8.

performance unless that claim was *plainly stronger* than those actually presented to the appellate court." *Id*. (emphasis added); *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013).

In his M.C.R. § 6.508(D) post-conviction motion, Rush pressed his appellate-IAC claim based on his contention that McCarthy had "failed to investigate and raise trial counsel's errors," which the Michigan trial court construed as a "failure to assert all arguable claims." The court rejected this claim because Rush had not shown (could not show) that these claims were plainly stronger than the sentencing claim that McCarthy did raise (successfully), and recognized that "winnow[ing] out weaker arguments" is not deficient performance but is appropriate appellate strategy. And the court further held that Rush could not show prejudice.

Ultimately, the absence of prejudice is dispositive. Contrary to Rush's (and the district court's) view of these claims, even if McCarthy had raised them, there is no reasonable likelihood that he would have prevailed on appeal, much less shown a different outcome at trial. The evidence was more than sufficient to convict Rush. And the Michigan court likely would have found no prejudice, as it did when rejecting Darnell's claim of coerced confession and when rejecting Rush's post-conviction motion. These trial-IAC claims were far from "dead bang winners."

More importantly, however, the Michigan court addressed these appellate-IAC claims on the merits in the post-conviction decision. As mentioned, AEDPA deference applies. *See Cowans v. Bagley*, 639 F.3d 241, 252 (6th Cir. 2011); *Harrington*, 562 U.S. at 98–101. We must deny the petition unless Rush "can demonstrate that the state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law or involved an unreasonable determination of the facts." *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017) (quotation marks and citation omitted). The governing law is *Strickland*, even for appellate IAC, *see Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009), and combined with AEDPA, *Strickland*'s deferential

standard "is raised even higher, as the petitioner must show that the state court's application of *Strickland* was itself unreasonable," *Kelly*, 846 F.3d at 832. This is a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quotation marks omitted); *see also Shinn v. Kayer*, 592 U.S. 111, 124 (2020) ("Under § 2254(d), . . . the only question that matters" is whether the state court's decision was "so obviously wrong as to be beyond any possibility for fairminded disagreement." (quotation marks and citations omitted)).

In short, the Michigan court concluded that McCarthy's decision on direct appeal to winnow out weaker arguments and focus on the sentencing issue—which was successful—was not evidence of IAC, explaining that McCarthy's "failure to assert all arguable claims" was not deficient performance," nor could Rush prove any prejudice. Under the doubly deferential lens of AEDPA and *Strickland*, even if Rush could show that appellate counsel McCarthy was ineffective for failing to raise other claims on direct appeal, Rush cannot show that the Michigan court's opposite conclusion was an unreasonable application of *Strickland*.[29]

Because Rush cannot prove appellate IAC, he cannot overcome the procedural default of his claims and we must deny his petition. We need not address the trial-court-IAC claims.[30]

---

[29] *See* fn. 26, *supra*. Rush makes a conclusory claim that the Michigan court's opinion was "contrary to" Supreme Court precedent, but Rush does not identify any such Supreme Court precedent, so this necessarily fails.

[30] Even if we reached these claims, they too would fail. The Michigan state court found, on the merits, that Rush's trial counsel was not ineffective. And the district court erred by failing to give that holding any AEDPA deference. The *Strickland* analysis that the district court rendered here was "no different than if" it "were adjudicating a *Strickland* claim on direct review." *See Harrington*, 562 U.S. at 101. "Under AEDPA, though, it is a necessary premise that the two questions are different." *Id.*; *see also id.* at 101 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). And once we apply this doubly deferential standard, the state court's decision was not unreasonable. Rush claims his counsel was ineffective for failing to challenge the voluntariness of his confession, failing to cross-examine any witnesses, and failing to allow him to testify. But it was not unreasonable for counsel to not challenge the confession where it could plausibly have been voluntary, nor to not cross-examine witnesses "because the codefendant's counsel questioned the

**V.**

For the forgoing reasons, we REVERSE the judgment of the district court and DENY the

petition for habeas relief.

---

witnesses." And Rush did not show that Gagniuk did not allow him to testify. We must defer to the state court's findings on the record. The district court therefore erred in its analysis on these claims as well.